**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 12 CR 284** |
| **v.** | ) | |
| | ) | **Judge Joan H. Lefkow** |
| **JACQUELINE KENNEDY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

On December 3, 2013, defendant Jacqueline Kennedy pleaded guilty in a blind plea to

counts 1, 6, 12, 17, and 18 of the superseding indictment filed against her on July 2, 2013. (Dkt.

449.) The court heard argument on objections to the Presentence Investigation Report ("PSR")

on May 30, 2014, and heard argument on relevant factors under 18 U.S.C. § 3553 on June 12,

2014. For the following reasons, the court finds that Kennedy's proper offense level under the

United States Sentencing Guidelines ("the Guidelines") is 37. Her criminal history category is I.

The resulting Guidelines sentencing range is 210-262 months and Kennedy's restitution

obligation is $4,815,740.

## BACKGROUND

On April 17, 2012, Kennedy was indicted in a 55-count indictment. (Dkt. 1.) A

superseding indictment followed on July 2, 2013 (dkt. 326), charging Kennedy and numerous co-

defendants with fraudulent schemes. The first is a tax fraud scheme operating between

approximately January 2008 and April 2010. The indictment charges Kennedy with using three

companies she owned and managed, ATAP Financial Enterprises, Inc., ATAP Tax & Business

1

Solutions, Inc., and ATAP Tax Services, Inc. (collectively, "ATAP"), to prepare false and fraudulent income tax returns. Kennedy attached false W-2 forms from fictitious entities to her clients' tax returns to inflate their Earned Income Tax Credit ("EITC"). The fraudulent scheme involves unemployment insurance ("UI") benefits and operated between approximately February 2009 and December 2012. The indictment charges Kennedy and her co-defendants with registering the fictitious companies they created with state unemployment agencies and then filing false UI benefits claims for fictional employees[1] who were purportedly terminated from the fictitious companies without fault. Proceeds from the UI claims were deposited on debit cards that Kennedy and her co-defendants used to withdraw the proceeds of their scheme. In all, Kennedy and her co-defendants are charged with bilking state unemployment insurance agencies in multiple states out of approximately $9.1 million dollars.

Kennedy initially self-surrendered and appeared before Magistrate Judge Susan Cox on April 30, 2012, at which time Magistrate Judge Cox entered an order setting the conditions of Kennedy's pretrial release and Kennedy was released on her own recognizance. (Dkts. 30-32.) Even though she had already been indicted, Kennedy continued her UI scheme. For example, on the day that she was released on bond she used fraudulently-obtained debit cards to withdraw over $2,200. (Dkt. 172 at 3.)

Kennedy continued to certify false UI claims so the claims would remain active and withdrew money using the debit cards during the spring and summer of 2012, causing the government to move to revoke her bond. (Dkt. 172.) Kennedy failed to appear at a hearing on the bond motion on September 19, 2012, and the court issued a bench warrant for Kennedy. (Dkt. 175.) On October 10, 2012, the court received a hand-written letter from Kennedy

---

[1] Kennedy and other participants in the fraudulent scheme either obtained identifying information (names, addresses, social security numbers) from individuals voluntarily or, in other cases, stole this information or purchased it from third parties.

informing the court that when she did turn herself in, "it will be because I respect you & your position." (Dkt. 194 at 3.) But instead of turning herself in, Kennedy continued her scheme, creating more fictitious companies and filing for UI benefits in different states. It took government agents over two months to find her. When they did locate Kennedy, who was living as a fugitive on the south side of Chicago, they found evidence of her ongoing UI scheme in her apartment. (*See* Government Sentencing Exhibits ("Gov't Sen. Ex.") 28-38.)

After she was located, Kennedy was placed in pretrial detention and the parties began preparing for trial, which was set for January 6, 2014. (Dkt. 311.) On December 4, 2013, however, the court held a change of plea hearing for Kennedy at which she pleaded guilty to counts 1, 6, 12, 17, and 18 of the superseding indictment. (Dkt. 449.) These counts included two counts relating to the tax fraud scheme, one count of wire fraud and one count of submitting false claims to the government in violation of 18 U.S.C. §§ 1343 and 287. (Gov't Sen. Ex. 1 at 8.) Kennedy admitted that she prepared approximately 70 false and fraudulent personal income tax returns, causing the IRS to issue approximately $158,000 in fraudulent tax refunds. (*Id.* at 19-20.) She also pleaded guilty to three counts of mail fraud, 18 U.S.C. § 1341, relating to the UI scheme. (*Id.* at 8-9.) She admitted that she created eight fake companies in Illinois and Indiana for the purpose of filing fraudulent unemployment claims. (*Id.* at 21.) She admitted that she caused an actual loss of at least approximately $379,000 and a potential loss of at least approximately $589,000. (*Id.* at 23.)

Following her guilty plea, Pretrial Services completed its PSR as to Kennedy and calculated Kennedy's recommended sentence pursuant to the Guidelines. (*See* dkt. 498 ("PSR").) The PSR calculates Kennedy's offense level at 39 and criminal history category at I, which results in a suggested sentencing range of 262-327 months. The PSR also calculates her

restitution obligation at $9,947,883.85.  (Dkt. 498.)  The parties filed briefs with objections to

and arguments on the relevant sentencing factors (dkts. 559, 564, 566), and the court heard

argument on objections to the PSR on May 30, 2014 ("the May 30 sentencing hearing"), and

argument on the 18 U.S.C. § 3553(a) factors on June 12, 2014.

## ANALYSIS

The court rules as follows with respect to Kennedy's objections to the PSR.

## I.     Tax Fraud Counts

### A.     Loss Amount

Kennedy objects to the loss amount of $546,619, arguing that (i) it includes tax returns

that the government failed to prove that she prepared or caused to be prepared, and (ii) it fails to

accurately credit portions of refunds to which the taxpayers were legitimately entitled.  She

devoted little time at May 30 sentencing or space in her sentencing papers to this objection,

however, recognizing that the tax offense is unlikely to affect Kennedy's Guidelines range.

Regardless, the court agrees with the government's proposed loss amount.  The

government explained that this amount does not include refunds to which taxpayers were

legitimately entitled.  It its second supplemental version of the offense, the government clearly

explains how the IRS calculated this amount and why this amount is, if anything, a conservative

estimate.  (*See* dkt. 514 at 3 ("Because some of the taxpayers did have some legitimate income

during the tax years in question, the IRS calculated the tax loss for the 208 false and fraudulent

returns by removing the fraudulent Form W-2 from the tax return submitted on behalf of the

taxpayer and recalculating the refund due and owing without that income."); *see also* dkt. 566,

Government's Sentencing Memorandum ("Gov't Memo") at 6-7 (explaining method of

calculating tax loss amount).)

The government also tied the tax returns to Kennedy herself. It produced examples of Kennedy's tax preparation invoices that include mysterious upward "adjustments" of roughly $600 that represented the fee for Kennedy's fraudulent tax preparation. (*See, e.g.*, Gov't Sen. Ex. 10.) The government also provided information regarding the fictitious companies used for the fraudulent W-2s, and many are the companies that Kennedy herself admitted to creating when she pleaded guilty. (Dkt. 514 at 4-9.) The government has shown by more than a preponderance of the evidence that Kennedy caused a loss to the IRS of at least $546,619 due to her tax fraud.

## B.     Sophisticated Means

Kennedy objects to the two-level enhancement in the PSR for using "sophisticated means" in her tax fraud scheme. This enhancement applies where the defendant engaged in "especially complex or especially intricate offense conduct . . . such as hiding assets or transactions, or both, through the use of fictitious entities." U.S.S.G. § 2T1.1(b)(2) cmt. n.5. The Seventh Circuit has held that the sophisticated means enhancement was properly applied even though "even more elaborate mechanisms to conceal [defendant's] fraudulent activities were possible" where a defendant arranged to have tax refund checks mailed to five different addresses, evaded discovery for six years, and used knowledge as a certified public accountant to structure the scheme in a way unlikely to attract IRS's attention. *United States* v. *Madoch*, 108 F.3d 761, 766 (7th Cir. 1997).

Kennedy created fictitious corporations and fake W-2s for her clients stating that they had been employed at those fictitious corporations. She then submitted these tax returns with her clients' taxes so that they could receive larger EITCs. She cites no cases for the proposition that

the sophisticated means enhancement was not intended to apply in this sort of situation. The PSR properly applies this two-point enhancement.

## II.    UI Fraud Counts

### A.    Loss Amount

By far, the most contentious issue in this sentencing is the loss amount for which Kennedy should be held responsible in relation to the UI fraud scheme. There are two main issues: whether Kennedy should be held responsible for losses caused by Kennedy's co-defendant Tara Cox, and whether Kennedy should be held responsible for the actual loss that she caused or the intended loss amount.

#### 1.    Loss caused by Cox

As noted, Kennedy recruited multiple co-defendants into her scheme. One of those was Cox. After Kennedy pulled Cox into the scheme, Cox began creating fictitious companies on her own, many of which Kennedy was not aware and for which Kennedy received no share of the profits. Of the 97 fictitious entities created in this overall scheme (*see* Gov't Sen. Ex. 62), the government argues that twelve are entities that Cox created at the request or direction of Kennedy (*see* Gov't Sen. Ex. 76) and 36 are companies that Cox created on her own (*see* Gov't Sen. Ex. 77 (documenting 61 companies in total linked to Kennedy).)

##### a.    Companies created by Cox for herself

Kennedy argues that she cannot be held accountable under Section 1B1.3 of the Guidelines for the losses caused by the companies Cox set up on her own because Cox's acts did not constitute "jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

To hold Kennedy liable for losses caused by Cox's companies, it must have been reasonably foreseeable to Kennedy that Cox would create these companies and cause these

losses, and Cox must have created them in furtherance of their common scheme or plan. *See United States* v. *Salem*, 597 F.3d 877, 884-91 (7th Cir. 2010). For two or more offenses to constitute a "common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3 cmt. n.9(A); *see also United States* v. *Zhaofa Wang*, 707 F.3d 911, 915 (7th Cir. 2013) ("Factors relevant in determining the scope of jointly undertaken activity include '(1) the existence of a single scheme; (2) similarities in modus operandi; (3) coordination of activities among schemers; (4) pooling of resources or profits; (5) knowledge of the scope of the scheme; and (6) length and degree of the defendant's participation in the scheme.'") (quoting *Salem*, 597 F.3d at 564).

Kennedy relies on two cases to support her argument that there is insufficient evidence to tie her to the 36 companies Cox created on her own. In *United States* v. *Ekanem*, 555 F.3d 172 (5th Cir. 2009), the Fifth Circuit determined that the district court erred in enhancing the defendant's offense level based on financial losses caused by another person who "provided start-up and operational support to" the defendant. *Id.* at 176. There was no evidence that the defendant assisted in the planning, provided material support, or shared in the profits of the other person's company, and the defendant's mere awareness that the other person was operating a fraudulent scheme was insufficient to hold him accountable for the losses the other person caused. *Id.* Kennedy also relies on *Salem*, 597 F.3d at 884-91, which discusses at length the "joint criminal activity" prong. *Salem* involved a large Internet fraud scheme that lasted several years with schemers in multiple countries, hundreds of victims, and losses of approximately $6 million. *Id.* at 889. The district court imposed liability on the defendants for the acts of their co-schemers but the Seventh Circuit remanded for further consideration, explaining that the district

court did not properly determine the scope of the joint criminal activity and that knowledge of co-schemers' acts is insufficient to establish jointly undertaken criminal activity. *Id.*

In opposition, the government relies on a case related to *Salem*, *United States* v. *Cerna*, 676 F.3d 605 (7th Cir. 2010), where the Seventh Circuit affirmed the sentence of one of the co-schemers there, including the district court's finding that the defendant should be responsible for acts of his co-schemers under § 1B1.3(a)(1)(B) based on the "similarity in the method of operation followed by all parties, the knowledge of the scope of the scheme by [the defendant] . . ., the length of time [the defendant] participated in the scheme (eight to nine months) and the degree of coordination between the co-defendants and [the defendant] (sharing information on exchange rates and the best Western Union offices to use; phone records showing calls between co-defendants; and obtaining false documents from the same source)." *Id.* at 610. The government also relies on *Zhaofa Wang*, 707 F.3d at 915-16, in which the Seventh Circuit held it was correct to hold the defendant accountable for the acts of his co-schemers where the defendant acknowledged that he conspired with others to engage in their scheme, the defendant was a "key participant" in the scheme, and the conspiracy's activities were "highly coordinated." This was so even though the defendant argued he was not aware of the scope of the scheme. *Id.* at 916.

At the May 30 sentencing hearing, Kennedy's counsel elicited testimony from Cox that Kennedy was not involved in creating the 36 fictitious entities that Cox set up on her own, which included entities in Illinois, Indiana, and Minnesota. Cox also testified that Kennedy did not share in the spoils of these companies, and Cox has generally testified that Kennedy was upset when she learned that Cox was creating companies for herself. (*See* dkt. 498, Ex. 1 at 61.)

The government has not shown by a preponderance of the evidence that Kennedy was involved in Cox's 36 fictitious corporations. While it does seem that Kennedy taught Cox how to create these fictitious entities, Cox's 36 companies seem to be part of a wholly separate scheme. In fact, the evidence demonstrates that Cox may have operated her scheme to the detriment of Kennedy's scheme. (*See* Gov't Sen. Ex. 58 at 1:19-36 (Kennedy explaining in a phone call with a third party that Kennedy's UI fraud scheme "got all messed up" because she "showed people how and they went and did their own thing").) The court thus finds that Kennedy cannot be held responsible for the losses attributable to the 36 companies Cox created on her own.

### b.    Companies allegedly created by Cox for Kennedy

Based on Cox's representations to the government, it argues that Cox created 12 fictitious companies at Kennedy's direction from August 2009 until September 2010. (*See* Gov't Sen. Ex. 76.) The government managed to connect four of these companies to Kennedy using other means.

Kennedy's counsel attempted to elicit testimony at the May 30 sentencing hearing to undermine Cox's statements that she created these 12 companies for Kennedy. For example, counsel questioned FBI Agent Lee Dahlgren, the lead investigator on this case, regarding inconsistencies in the time frames that Cox gave to government investigators surrounding the creation of fraudulent companies for herself and for Kennedy. Kennedy's counsel argued that Cox was already creating her own companies when Kennedy allegedly taught her how to do so. Kennedy's counsel also attempted to undermine Cox herself on cross-examination, highlighting potential inaccuracies on Cox's 2012 tax return, the profits that Cox and her mother, Rowena Pughsley, made from the scheme, and Cox's alleged obsessive gambling and shopping habits.

With only Cox's testimony, the government has not met its burden to show by a preponderance of the evidence that Kennedy should be held responsible for the eight companies Cox purportedly created "for Kennedy." Kennedy's counsel successfully demonstrated to the court that Cox is not a reliable witness. The government acknowledges in its sentencing papers that it only has evidence to tie four of the 12 companies to Kennedy through means other than Cox's testimony. (*See* dkt. 566 at 16-17 ("The use of those four companies by Kennedy as part of her tax scheme shows that Kennedy was aware of Cox's registration of those companies, and that those companies were registered on Kennedy's behalf.").) The government does not demonstrate that Kennedy profited from the other eight companies, nor is the court convinced that Kennedy's statement in a recorded phone call that she showed somebody else how to create fictitious companies is sufficient to tie them to her.

The court does agree with the government, however, that there is enough evidence to attribute the four other companies to Kennedy:

- Cox testified that she created Brock Document Services, Inc. ("Brock") for Kennedy. The government also presented evidence that Brock's name was found on a list of fictitious companies during a search of ATAP, the purported owner of Brock was an ATAP client whose taxes were prepared by ATAP, and ATAP submitted falsified wage information to the IRS using fake W-2s from Brock.
- Cox testified that she created Brite Cleaning Services, Inc. ("Brite") for Kennedy. The government also presented evidence that the purported owner of Brite was an ATAP client whose taxes were prepared by ATAP and ATAP submitted falsified wage information to the IRS using fake W-2s from Brite.
- Cox testified that she created Rogers Happy Home, Inc. ("Rogers") for Kennedy. The government also presented evidence that ATAP submitted falsified wage information to the IRS using fake W-2s from Rogers.
- Cox testified that she created Stars Lane, Inc. ("Stars") for Kennedy. The government also presented evidence that ATAP submitted falsified wage information to the IRS using fake W-2s from Stars.

Thus, the only losses the court attributes to Kennedy regarding companies Cox created are from Brock, Brite, Rogers and Stars. The actual loss from these four companies totals

$157,803 and the intended loss totals $644,570.  (*See* Gov't Sen. Ex. 76.)  The court addresses

the impact this has on Kennedy's Guidelines sentencing range and restitution obligation below.

### 2. Loss calculation

#### a. Actual versus intended loss

Kennedy objects to the loss amount of $37,298,066.51[2] for the UI scheme, which

represents the intended loss.  The Guidelines provide that in calculating the offense level for

economic offenses, the court should add points based on the loss amount.  U.S.S.G.

§ 2B1.1(b)(1).  The loss amount "is the greater of actual loss or intended loss."  *Id.* cmt. n.3(A).

Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense."  *Id.* at

3(A)(i).  Intended loss means "the pecuniary harm that was intended to result from the offense,"

which "includes intended pecuniary harm that would have been impossible or unlikely to occur."

*Id.* at 3(A) (ii).

Kennedy argues that the government's intended loss amount is too high because the

government cannot prove that she actually had the subjective intent to cause such losses.  She

relies on cases in which the Seventh Circuit held that the district court incorrectly calculated the

intended loss amount because the defendant knew that it would not be possible to cause a loss as

great as that which the government accused him of causing.  In *United States* v. *Berheid*,

421 F.3d 538 (7th Cir. 2005), the Seventh Circuit held that the district court improperly

calculated intended loss when the loss amount it used surpassed the defendant's subjective belief

of the potential loss.  *Id.* at 541-42.  The defendant induced a bank to delay collection efforts on a

loan he had legitimately taken out by granting the bank a security interest in property he did not

own.  The district court held that intended loss was outstanding amount on the loan but Seventh

[2]  As discussed in Part II.A.1 above, Kennedy will not be responsible for this entire loss amount because much of it stems from the companies that Cox created that were not tied to Kennedy by a preponderance of the evidence.

Circuit reversed. It held that because the defendant did not subjectively believe that the assets he fraudulently transferred to the bank had the same value as the outstanding loan amount, the district court could not use the outstanding loan amount as the intended loss. *Id.* at 541-52. Similarly, in *United States* v. *Fearman*, 297 F.3d 660 (7th Cir. 2002), the Seventh Circuit explained that "the relevant understanding of values for purposes of determining intended loss under the sentencing guidelines is that of the criminal, not that of the victim." *Id.* at 661; *see also United States* v. *Middlebrook*, 553 F.3d 572, 578-79 (7th Cir. 2009) (intended loss stemming from promissory note properly calculated based on defendant's belief that he had assets to pay back the value of the note).

The court is not convinced that any of these cases is applicable to the situation at hand. The government's citations and other precedent are far more convincing. For example, the government cites *United States* v. *Rettenberger*, 344 F.3d 702 (7th Cir. 2003), which affirmed the district court's decision in a disability fraud cases that the defendant would have continued faking a disability until he aged out of benefits to obtain the maximum insurance benefits. *Id.* at 708. The defendants complained that this was not supported by any evidence, but the court found that irrelevant, stating that "we do not see why evidence beyond the facts of the crime and the terms of the policies was needed. [The defendant] set out to take the insurers for all they were worth, and that meant benefits through age 65." *Id.* In another UI benefits scheme case involving disaster relief benefits, the Eleventh Circuit held that it would have been proper for the district court to calculate the loss amount based on "the maximum possible loss amount" because the "district court was entitled to find that, to support their lavish lifestyle, [the defendants] intended to get as much money as they possible could from the claims they were submitting but were apprehended before all of the losses and the monies could be paid." *United States* v.

*Kannell*, 545 F. App'x 881, 887 (11th Cir. 2013) (internal quotation marks and citation omitted); *see also United States* v. *Rosen*, 726 F.3d 1017, 1024 (7th Cir. 2013) (intended loss in fraud scheme involving development of affordable housing project correctly calculated as "the amount of public funding the City earmarked" for the project, even though that definition of intended loss "requires a presumption that [defendant] would have taken additional affirmative steps in furtherance of the fraud" because the defendant was a "true con artist [with] . . . no qualms about doing whatever he deemed necessary in order to carry out his fraudulent scheme to its most lucrative end"); *United States* v. *Lorefice*, 192 F.3d 647, 654-55 (7th Cir. 1999) (loss amount in insurance fraud scheme included entire amount that could be paid out to defendant even though he would have had to continue paying premiums to obtain policies' face amounts and despite potential difficulty in carrying out scheme).

Kennedy argues that there is no indication that she intended to certify each of her UI benefits claims for 99 weeks, the maximum possible time period. Kennedy's counsel argued at the May 30 sentencing hearing that Kennedy knew that none of her claims would last for 99 weeks, relying on the fact that at some point at the end of 2009, Cox was interviewed by the Illinois Department of Employment Security ("IDES") regarding possible fraud. But this argument does not hold water. Kennedy began her scheme months before Cox was interviewed. Kennedy set out to take the agencies for "all they were worth." She continued certifying claims, had a system set up for taking money out of ATMs, and even continued the scheme after she was caught. Each time that she was caught in one state she simply made false claims in another state. There is no reason to think that she wanted anything less than everything she could get. In such a case, the government is entitled to use the maximum possible loss amount, which is the amount she was eligible to receive for each of the UI claims. *See Kannell*, 545 F. App'x at 887; *Rosen*,

726 F.3d at 1024. Kennedy showed herself willing to take the necessary steps to continue certifying claims so she could continue profiting from her scheme. *See Lorefice*, 192 F.3d at 654-55. For all of these reasons, Kennedy's argument that the intended loss is inflated because she lacked the subjective intent to cause the loss fails.[3]

The court thus finds that Kennedy's loss amount is properly calculated by taking the intended loss for all claims attributable to her.

### b. Evidence against Kennedy

Kennedy challenges the evidence that the government presented to tie the 53 remaining fictitious companies to her. The government placed each fictitious company in various categories to show how it was tied to Kennedy; some companies fit in more than one category. (*See* Gov't Sen. Ex. 62.) The first two categories are companies that Kennedy admitted to creating or companies whose associated UI debit cards Kennedy admitted to using; there is no question as to whether the government has met its burden in showing that Kennedy should be responsible for losses associated with these companies. The third category consists of companies whose UI debit cards Kennedy was captured on ATM cameras using, and the government has met its burden to show Kennedy is responsible for these losses. The fifth category consists of companies tied to Kennedy by her handwriting. As part of the UI benefits scheme, she was

---

[3] Kennedy also argues that an application note in the Guidelines requires the use of actual loss rather than intended loss. The note states,

In a case involving government benefits (e.g., grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.

U.S.S.G. § 2B1.1 cmt. n.3(F)(ii). There is nothing in the Guidelines that says that actual loss, not intended loss, should guide the sentence in government benefits cases. Instead, this Application Note provides that in a situation where a defendant takes what is owed to him and more, he can only be liable for the "and more," not what was actually owed to him. This Application Note is inapplicable.

required to pay small unemployment taxes, and companies in the fifth category have her handwriting on the associated money orders. The seventh category is companies whose details were found (often in Kennedy's handwriting) as the result of a December 2012 search warrant for the apartment where Kennedy lived as a fugitive. Thus, the government has met its burden of associating companies in categories one, two, three, five, and seven with Kennedy.

The fourth, sixth, eighth, and ninth categories are somewhat more controversial.[4] The fourth category consists of companies tied to Kennedy because the email addresses used to create the companies were created using the Internet Protocol ("IP") addresses associated with ATAP. The sixth category consists of companies that were found on a list during a search of ATAP in April 2011. The eighth category represents companies whose purported owners were ATAP clients, and the ninth category represents companies used to submit fictitious W-2s to the IRS from ATAP. At the May 30 sentencing hearing, Kennedy's counsel attempted to demonstrate that Kennedy was not the only person with access to the ATAP office, that, when the government conducted its April 2011 search of the office the file cabinets were unlocked and the office set-up was an open layout so anyone could see what anyone else was doing, and that people other than Kennedy (including Cox's mother, Pughsley) prepared tax returns for ATAP. The government responded with evidence from Agent Dahlgren that the layout of ATAP was not the same in 2011 as it had been in 2009, and Cox testified that the file cabinets were regularly locked.

The court finds that the government has shown by a preponderance of the evidence that all of these companies are linked to Kennedy. First, many of the companies at issue are tied to Kennedy in other ways. For example, of the 11 companies created using email addresses

---

[4] The tenth and eleventh categories are companies associated with Cox, which are discussed in Part II.A.1, above.

originating from ATAP's IP addresses, seven are tied to Kennedy through money orders with her handwriting, her admissions regarding usage of the debit cards, or her admission that she created the companies. Of the 14 companies on a list discovered when the April 2011 search warrant was executed, nine are tied to Kennedy through money orders, her admissions, or ATM photos. Of the 20 companies whose purported owner is an ATAP client, 11 are tied to Kennedy by the other means described. Of the 20 companies used to prepare fake W-2s to submit with ATAP clients' tax returns, 11 are tied to Kennedy in the other ways described. It is clear from this evidence that Kennedy was involved with companies that were identified through ATAP.

Second, many companies in these four categories are linked to each other in other ways. For example, Kennedy admitted to using debit cards linked to Key Catering Company, which was created with an email address originating from ATAP's IP addresses, and information about Key Catering was found during the April 2011 search of ATAP, its purported owner is an ATAP client, and it was used to create fake W-2s for an ATAP client.

Third, the government provided evidence from various witnesses for whom Kennedy had prepared income tax returns and then used their information for fictitious UI benefits claims. For example, the government submitted interview notes with an individual named Andrew Borders who had his taxes prepared by Kennedy and whose information was subsequently used for UI benefits. (*See* Gov't Sen. Ex. 14; *see also* Gov't Sen. Exs. 11, 15, 39.) This evidence demonstrates that Kennedy would use her clients' information to further her UI benefits scheme.

Finally, considering all of the evidence presented, the court finds that Kennedy exercised such a degree of control over ATAP, its office, and much of the scheme in general that it is logical to tie losses associated with companies in these four categories to Kennedy.

### c. Resulting loss amount

Excluding losses except for those attributable solely to companies created by Cox for herself and companies Cox purportedly created for Kennedy but that are not tied to Kennedy in any other way, Kennedy's actual loss amount is $4,269,121, and her intended loss amount is $13,815,862.85. The court calculated these numbers by subtracting the loss amounts from the eight companies not attributable to Kennedy on Government Sentencing Exhibit 76 ($1,005,732.50 in actual loss, $6,638,844 in intended loss) from the loss amounts listed on Government Sentencing Exhibit 77.

### B. Sophisticated Means Enhancement

Kennedy again objects to the sophisticated means enhancement that the PSR applied to her UI scheme offense. (PSR at 20.) She argues the conduct in this scheme was "typical, in fact necessary, for unemployment benefits fraud." (Dkt. 559 at 11.) She cites no case law for this.

The sophisticated means enhancement for fraud applies in the case of "especially complex or especially intricate offense conduct" such as "hiding assets or transactions, or both, through the use of fictitious entities." U.S.S.G. § 2B1.1 cmt. n.9(b). The Seventh Circuit recently confirmed, in the context of a banking scheme, that "[t]he use of fictitious entities or corporate shells generally indicates a sophisticated means." *United States* v. *Maddox*, 551 F. App'x 275, 276 (7th Cir. 2014) (citing U.S.S.G. § 2B1.1 cmt. n.8(B); *United States* v. *Allan,* 513 F.3d 712, 715-16 (7th Cir. 2008)); *see also United States* v. *Anobah*, 734 F.3d 733, 739 (7th Cir. 2013) (sophisticated means enhancement properly applied where scheme involved creation of false loan applications and false documents to support misinformation in false loan applications, straw purchasers, properties in two states, lengthy scheme, and multiple co-schemers). Here, Kennedy's scheme lasted years, involved the creation of almost 100 fictitious

entities, employed numerous people, and, as the government says, is one of the largest fictitious employer unemployment schemes of which the government is aware. (Dkt. 566 at 21.) The scheme was clearly sophisticated and the two-point enhancement applies.

### C. Five or More Means of Identification Enhancement

Kennedy argues in her sentencing papers that the PSR was incorrect to apply a two-point increase for "the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification." (PSR at 20 (citing U.S.S.G. § 2B1.1(11)(C)(ii)).) At sentencing, however, Kennedy's counsel conceded that this increase applies, and the court agrees.

### D. Organizer or Leader Enhancement

The PSR found that Kennedy was an organizer or leader of the UI scheme and thus applied a four-point increase to her base offense level. (PSR at 20 (citing U.S.S.G. § 3B1.1(a).)) Kennedy argues, however, that she was a "manager" of the scheme and should only be subject to a two-point increase.

Section 3B1.1 of the Guidelines discusses enhancements for aggravating roles. A defendant's offense level is increased by four points if she "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The level is increased by three points if she was "a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." *Id.* § 3B1.1(b). Finally, a two-point increase applies "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)." *Id.* § 3B1.1(c).

It is apparent to the court that the scheme at issue falls into either (a) or (b) of section 3B1.1. This scheme involved at least 16 participants, counting by the number of Kennedy's co-defendants, and was extensive. Kennedy recruited numerous co-schemers. The UI fraud lasted for years, involved the creation of over 50 fictitious organizations relating to Kennedy, and defrauded agencies in multiple states.

To determine whether Kennedy should receive the additional four points for being an organizer or leader, the court considers factors such as the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the degree of participation in planning or organizing the offense, and the nature and scope of the activity in determining whether someone is an organizer or leader. *See* USSG § 3B1.1 cmt. n.4. The Guidelines note that there can be more than one organizer or leader. *See id.*

Kennedy began the UI fraud scheme, recruited multiple accomplices, directed her co-conspirators, created companies in multiple states, coordinated her multiple "runners," directed others to collect personal information, distributed money to her co-schemers, and generally ran the scheme. Even if she were to argue that Cox was an organizer or leader, Kennedy could still receive a four-point increase, as there can be more than one organizer or leader. The court rules that the four-point enhancement applies.

## III. Miscellaneous PSR Objections

### A. Acceptance of Responsibility

Kennedy argues that she is entitled to a two-level decrease in her offense level for acceptance of responsibility. Under the Guidelines, defendants are entitled to up to a three-point increase in their offense levels if they "clearly demonstrate[ ] acceptance of responsibility." U.S.S.G. § 3E1.1(a) (two-point decrease for acceptance of responsibility); *see also id.* at (b)

(additional one-point decrease if offense level is 16 or greater and government moves for decrease stating that defendant assisted authorities in investigation or prosecution by timely notifying of intent to plead guilty). "Simply pleading guilty does not entitle a defendant to an automatic reduction [for acceptance of responsibility]." *United States* v. *McIntosh*, 198 F.3d 995, 999 (7th Cir. 2000); *see also* U.S.S.G. § 3E1.1 cmt. n.3 ("A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right."). It is for the district court to decide whether, despite a defendant's guilty plea, a defendant's "demeanor and testimony during the sentencing hearing demonstrate[s] that she has not accepted responsibility for her actions." *Maddox*, 551 F. App'x at 277.

Kennedy argues that she is, in effect, being punished for not admitting to all the bad deeds the government attributes to her. Kennedy's counsel noted at the May 30 sentencing hearing that Kennedy went so far as to write a letter to the court when she was on the lam. But Kennedy never surrendered. Instead, she wasted enormous government resources as agents from various agencies attempted to track her down. While it is admirable that Kennedy has admitted to some wrongful conduct, it is clear that she has not admitted to the full extent of the fraudulent schemes and neither the government nor the court understands the basis for her admitted loss amounts. The government's evidence clearly ties her to far greater losses than those to which she admits. (*See generally* dkt. 498 at 40-89 (Government's Version of the Offense and Supplemental Version of the Offense); dkt. 514 at 3-9 (Government's Second Supplemental Version of the Offense).) That Kennedy argues that she was not an organizer or leader of an extensive scheme further demonstrates to the court that she is not taking responsibility for her acts.

Moreover, Kennedy received an upward adjustment in her offense level for obstruction of justice. (PSR at 21 (citing U.S.S.G. § 3C1.1).) She received this adjustment for producing false documents to another defendant to supply to IDES to make her UI claim appear to be legitimate, and for absconding while on bond release. (*Id.*) Kennedy does not contest this adjustment. The Guidelines provide, "Conduct resulting in an enhancement [for obstruction of justice] ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct" except in "extraordinary cases." U.S.S.G. § 3E1.1 cmt. n.4. Kennedy has made no showing that this is an extraordinary case in which she can be credited with accepting responsibility despite providing false documentation to interfere with an investigation of UI claims and living as a fugitive for over two months. Kennedy is not entitled to any reduction for acceptance of responsibility.

### B.      Other Criminal Conduct

The parties agree that paragraph 97 of the PSR should be stricken. The court requests that Pretrial Services strike this paragraph from the PSR.

### C.      Medical Attention

Kennedy argues that it is unclear why certain facts are highlighted in paragraph 120 of the PSR. That paragraph states that Kennedy has refused certain medical treatment while in custody of the Bureau of Prisons ("the BOP"). Kennedy argues that her refusal of treatment should not be held against her. The court can assure Kennedy that it will not hold this fact against her at sentencing but sees no reason to strike the paragraph.

## IV.    Guidelines Calculation

On the basis of the court's above determinations, it makes the following Guidelines calculations.

**Tax Scheme Calculations:**

| Base offense level (U.S.S.G. §§ 2T1.1(a)(1), 2T4.1(H)) | 20 |
|---|---|
| Enhancement because Kennedy was in the business of preparing tax returns (U.S.S.G. § 2T1.4(b)(1)(B) | 2 |
| Sophisticated means enhancement (U.S.S.G. § 2T1.4(b)(2)) | 2 |
| Obstruction of justice enhancement (U.S.S.G. § 3C1.1) | 2 |
| **TOTAL** | **26** |

**UI Scheme Calculations:**

| Base offense level (U.S.S.G. § 2B1.1(a)(1)) | 7 |
|---|---|
| Enhancement based on loss amount (U.S.S.G. § 2B1.1(b)(1)(K)) | 20 |
| Sophisticated means enhancement (U.S.S.G. § 2B1.1(b)(10)(C)) | 2 |
| Five or more means of identification enhancement (U.S.S.G. §2B1.1(b)(11)(C)(ii)) | 2 |
| Leader or organizer enhancement (U.S.S.G. § 3B1.1(a)) | 4 |
| Obstruction of justice enhancement (U.S.S.G. § 3C1.1) | 2 |
| **TOTAL** | **37** |

The offenses do not group. The tax fraud scheme offense is disregarded because it is nine or more levels below the UI fraud scheme offense level of 37. *See* U.S.S.G. § 3D1.4(c). The offense level is thus 37. Given Kennedy's criminal history category of I, her Guidelines range is 210-262 months.

**Restitution obligation**:

| | |
|---|---|
| Tax scheme restitution amount | $546,619 |
| UI scheme restitution amount | $4,269,121 |
| **Total restitution amount** | **$4,815,740** |

## CONCLUSION

For the reasons stated above, the court makes the following findings. Kennedy's loss amount for the tax fraud scheme is $546,619. The actual loss amount for the UI benefits fraud scheme is $4,269,121. The intended loss amount for the UI benefits scheme is $13,815,862.85. Kennedy's offense level is 37 and her criminal history is category I, giving her a Guidelines sentencing range of 210-262 months. Her restitution obligation is $4,815,740.

Date:   June 12, 2014